GEORGIA MARBLE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 100555.   Promulgated March 10, 1942.

*M. E. Kilpatrick, Esq.*, and *E. D. Smith, Jr., Esq.*, for the petitioner.
*Ralph E. Smith, Esq.*, for the respondent.

554

OPINION.

BLACK: The sole remaining issue for our determination is whether, in computing the surtax on undistributed profits under section 14 of the Revenue Act of 1936, petitioner is entitled to a "credit" such as is provided in section 26 (c) (1) of the same act, relating to contracts restricting dividends. This latter section is set forth in the margin.[1]

The respondent in his deficiency notice took the position that the first mortgage trust indenture executed November 1, 1926, did not constitute a contract restricting the payment of dividends within the meaning of section 26 (c) (1), *supra*, for the reason that it did not restrict the payment of "stock" dividends, and he further contends that petitioner is not entitled to a credit under the section named for the additional reason that it does not appear that a dividend during the taxable year to the extent of the adjusted net income would have reduced the net quick assets as defined in the trust indenture below $500,000. The respondent requests the Board to find as a fact that "Petitioner's net quick assets on December 31, 1936, were in excess of $900,000."

Petitioner contends that its net quick assets throughout the entire taxable year 1936 were at all times below $500,000; and, that, therefore, with the one exception stated below, it could distribute no amount within the taxable year as dividends, in any form whatever, without violating a provision of a written contract executed by it prior to May 1, 1936, namely, the trust indenture executed November 1, 1926, providing in part that "no dividends shall be paid in any event that would reduce the net quick assets of the Company below five hundred thousand dollars ($500,000.00)." The one exception is an admission in petitioner's brief that "Admittedly a taxable dividend payable in common stock could have been declared and paid to the preferred stockholders to the extent of $294.00."

---

[1] SEC. 26. CREDITS OF CORPORATIONS.

In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax—

\* \* \* \* \* \* \*

(c) CONTRACTS RESTRICTING PAYMENT OF DIVIDENDS.—

(1) PROHIBITION ON PAYMENT OF DIVIDENDS.—An amount equal to the excess of the adjusted net income over the aggregate of the amounts which can be distributed within the taxable year as dividends without violating a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the payment of dividends. If a corporation would be entitled to a credit under this paragraph because of a contract provision and also to one or more credits because of other contract provisions, only the largest of such credits shall be allowed, and for such purpose if two or more credits are equal in amount only one shall be taken into account.

If petitioner's net quick assets at any time during the taxable year equaled or exceeded $500,000, plus its adjusted net income of $123,-985.56, or a total of $623,985.56, it is at once apparent that petitioner would not be entitled to any credit under section 26 (c) (1) for the reason that in the language of the statute its adjusted net income would not be in excess of "the aggregate of the amounts which can be distributed within the taxable year as dividends without violating a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the payment of dividends." Cf. *Thew Shovel Co.*, 45 B. T. A. 920. We have found as a fact that petitioner's net quick assets on December 31, 1936, were in the amount of $589,273.65, less whatever surtax on petitioner's undistributed profits is determined in this proceeding. Therefore, it seems clear that petitioner could have paid a cash dividend without violating the provisions of the contract in question. We shall give our reasons for finding that petitioner's net quick assets on December 31, 1936, were in the amount of $589,273.65, less the tax we have mentioned.

Referring to our schedule of quick assets and liabilities set out in our findings of fact, petitioner concedes that items (a), (b), (d) and (f) are quick assets, and the respondent concedes that items (h) to (k), inclusive, are such liabilities as should be deducted from the quick assets in arriving at the net quick assets. Respondent contends that there should be added to item (b), $146,576.39 as item (c). For reasons which we shall state later, we sustain respondent as to $2,216.05 of this amount and we have included it in our computation of petitioner's net quick assets at the basic date.

Relative to item 2 of the condensed balance sheet set out in our findings, petitioner admits that of the total amount of notes and accounts receivable, the amount of $349,479.38 thereof, less a reserve of $28,138.36, or $321,341.02, represents quick assets (item (b) of our table of quick assets shown in our findings of fact), but contends that the balance of $582,088.18 thereof, less a reserve of $435,511.79, or $146,576.39, were not good and collectible as those terms are used in the trust indenture, and, therefore, should not be considered as quick assets. This balance is made up of the following items:

| Item | Face amount | Reserve | Balance |
|---|---|---|---|
| Regular customers | $24, 895. 90 | | |
| Palmer Construction Co | 214, 381. 27 | | |
| White Chapel Memorial Co | 99, 640. 82 | | |
| Acacia Mausoleum Corporation | 43, 846. 23 | | |
| | 382, 764. 22 | $249, 511. 79 | $133, 252. 43 |
| Officers and directors | 192, 107. 91 | 186, 000. 00 | 6, 107. 91 |
| Two demand notes | 5, 000. 00 | none | 5, 000. 00 |
| Series of notes (Goodloe H. Yancey) | 2, 216. 05 | none | 2, 216. 05 |
| Total | 582, 088. 18 | 435, 511. 79 | 146, 576. 39 |

It must be remembered that in determining what are "quick assets" within the meaning of the trust indenture, we must resort to the definition contained in the trust indenture itself. It provides that in making up this total, "good and collectible" bills and accounts should be included. It also provides that "notes or debts due by insolvent debtors shall in all events be excluded from such computation." It seems clear that the $146,576.39 in question did not represent bills and accounts of insolvent debtors. Petitioner does not contend otherwise. Petitioner does contend, however, that the bills and accounts which we have set out above, aggregating $582,088.18, against which a reserve of $435,511.79 had been set up on petitioner's books, leaving a net of $146,576.39, were either so doubtful or so slow as to eliminate them from a proper classification as "good and collectible bills and accounts." As to $2,216.05 of the $146,576.39, petitioner is not sustained. The evidence establishes that this $2,216.05 consisted of a series of notes aggregating $2,216.05 given by Goodloe H. Yancey. These notes were promptly paid at maturity. Petitioner's own witness testified as to these notes as follows: "The Goodloe Yancey notes were perfectly all right but were not due until 1938, 1939 and 1940." We think these notes should be included in the total of petitioner's bills and accounts which were "good and collectible." The mere fact that they were not immediately due and payable at the end of 1936 would not be sufficient to exclude them. There is no reason to interpret the words "good and collectible" that narrowly.

Petitioner introduced the testimony of two witnesses who were familiar with the notes and accounts which have been excluded, and the substance of their testimony was that they were familiar with the financial condition of the debtors and that in their opinion none of these bills and accounts were properly includible in "good and collectible" bills and accounts receivable. They gave their reasons, which, with the exception of the $2,216.05 we have mentioned above, seem to us plausible. These witnesses both testified that the reserves set up against these bills and accounts, while adequate for general accounting purposes, did not convert the amounts over and above the reserves into quick assets. They testified that the balance over and above the reserves was the amount which petitioner hoped ultimately could be realized out of them but that on December 31, 1936, no collections on them could have reasonably been forecasted. Respondent cross-examined these two particular witnesses with reference to the bills and accounts in question and brought out that altogether petitioner, during the years 1937, 1938, 1939, and 1940, collected $71,430.22, charged off $189,530.75, and had a remaining balance on December 31, 1940, of $321,127.21, against which there existed a remaining reserve of $245,-981.04.

The above facts, of course, show that these bills and accounts had considerable value at December 31, 1936, perhaps the net value which petitioner had given them in its balance sheet at the end of 1936. In fact, we do not understand that petitioner disputes that they had that much ultimate value, but petitioner does dispute that they were "quick assets" at that time. We agree with petitioner that the facts above given demonstrate that the bills and accounts in question, with the exception of the $2,216.05 we have named, should not be classified as a part of petitioner's "quick assets" at December 31, 1936. On this point we sustain petitioner.

*Item* (*e*) (*1*), *$24,159.46.*—This amount represented cash deposited with the trustee as a sinking fund for the redemption of first mortgage bonds outstanding. Petitioner contends that it should not be included as a quick asset because the amount was in the hands of the trustee. While it is true that this $24,159.46 was in the hands of the trustee on December 31, 1936, it was nevertheless the property of petitioner and remained so until it was applied to the payment of petitioner's outstanding first mortgage bonds. The fact that it represented funds which had been earmarked does not seem to us sufficient to exclude this amount from the definition of quick assets as contained in the trust indenture. It would, of course, have been within the power of petitioner to have excluded this sinking fund cash in the definition of quick assets contained in the trust indenture, but it did not do so. For example, petitioner did exclude from the definition of "quick assets" all personal property which formed a part of the company's plants or office equipment. It made no such exclusion of sinking fund cash in the hands of the trustee. Under the trust indenture all of petitioner's property of every kind and nature was assigned to the trustee as security for the payment of the bonds by the following paragraph taken from the trust indenture:

Now, Therefore, * * * for the purpose of securing the payment of the principal and interest of all of the aforesaid bonds * * * the Georgia Marble Company does hereby grant, assign and convey unto the Mercantile Trust and Deposit Company of Baltimore, and its successors in the trust hereby created, all of the property, real and personal, now owned by said Marble Company, or hereafter during the existence of the trusts created by this indenture to be acquired by it.

The sinking fund was still petitioner's property, although in the hands of the trustee, and, being in the form of cash, we hold that it should be included as a part of petitioner's quick assets.

*Item* (*e*)(*2*), *$14,175.53.*—This amount represents cash deposited with the trustee in connection with the disposition of some plant property. For the same reasons stated with reference to item (e) (1) above, we hold that the $14,175.53 in question should be included as a part of petitioner's "quick assets."

*Item (g), $146,144.*—This amount represents the cash surrender value on December 31, 1936, of certain life insurance policies on the life of Sam Tate who owned approximately 65 percent of petitioner's stock. The reason given by petitioner for not including this item as a quick asset is very much the same as the two previous items, namely, that the policies were assigned to the trustee, and were not available to petitioner. In our discussion under the previous item, we pointed out that under the trust indenture all of petitioner's property, both real and personal, had been assigned to the trustee. But we fail to see why that is a valid reason for excluding the cash surrender value of these policies from the classification of quick assets as that term is defined in the trust indenture and especially in view of the fact that the definition of quick assets contained in the trust indenture does not exclude this asset. Certainly the cash surrender value of a life insurance policy is the equivalent of cash and must be held to have "a readily realizable cash market value" as that phrase is used in the trust indenture. As to the cash surrender value of these policies, we sustain respondent.

We come now to item 4 of the balance sheet relating to investments in the net amount of $214,248.27. Petitioner admits that of this amount $279.62 should be included in the quick assets. See item (f) of the schedule of quick assets set out in our findings. The respondent contends that the balance of investments in the amount of $213,-968.65 should be included as quick assets. We do not agree with this contention. While these assets embraced in the term "investments" undoubtedly had considerable value, it is our opinion that petitioner has sufficiently proven, for reasons not necessary to discuss in detail, that these assets do not qualify as "quick assets" within the meaning of that term as used in the trust indenture, and, therefore, should be excluded, as we have done in our findings of fact. The corporation had many valuable assets which could not be classified as "quick assets" under the definition of the trust indenture.

The net result of our findings above is that out of its adjusted net income of $123,985.56 for the year 1936, petitioner could have distributed to its stockholders in cash dividends $89,273.65, less the surtax on undistributed profits determined in this proceeding, without violating the provisions of a written contract executed by petitioner prior to May 1, 1936. To the extent of this $89,273.65, less the tax, petitioner is not entitled to a credit under section 26 (c) (1). To the extent of the balance of its adjusted net income for 1936 it is entitled to such a credit.

The amount of petitioner's "net quick assets" is determined by subtracting from the aggregate of its quick assets the amount of its lia-

bilities except the amount due on its outstanding bonds. One of the liabilities which had to be subtracted was liability for taxes. In this proceeding, the petitioner has conceded that it is liable for the $10,-693.38 normal tax which the Commissioner has determined in his deficiency notice. Both parties have agreed that this $10,693.38 should be classed as one of petitioner's liabilities in arriving at the amount of its net quick assets at December 31, 1936, and it has been so classed in the computation we have made.

Petitioner has contested its liability for any surtax on its undistributed profits. However, as a result of our decision herein, there will be a surtax on undistributed profits and petitioner will be entitled to have that amount deducted as a liability in determining its net quick assets at the end of 1936, the same as the $10,693.38 normal tax named above. This should be done in a computation under Rule 50. Cf. *Floyd, Inc.*, 43 B. T. A. 101.

In the deficiency notice the Commissioner, among other things, stated as follows:

The credit claimed on your return for contracts restricting dividend payments is disallowed for the reason that the bond indenture executed November 1, 1926 does not constitute a contract restricting the payment of dividends within the meaning of Section 26 (c) of the Revenue Act of 1936 as it does not restrict the payment of stock dividends. * * *

Respondent nowhere in his brief contends anything about the ability of petitioner to have paid taxable stock dividends in 1936. Respondent devotes his entire brief to a discussion of the issue that petitioner's net quick assets were such that it could have declared cash dividends in 1936 without violating the provisions of any written contract entered into prior to May 1, 1936. It was stated to us at the hearing that this represented the only issue which was submitted to us for decision. Therefore, we have construed this to mean that respondent no longer presses the holding in his deficiency notice that petitioner could have paid taxable stock dividends in 1936 to the extent of its adjusted net income for that year. Having held herein that petitioner could have paid $89,273.65 cash dividends in 1936, less surtax on undivided profits, without violating the terms of any written contract, we make no attempt to decide what, if any, taxable stock dividends petitioner could have paid in 1936.

*Decision will be entered under Rule 50.*